## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

KARL FONTENOT,

      Plaintiff,

v.

the CITY OF ADA; Ada Police Department
Detectives MIKE BASKIN; Sandra Sue Smith as
Personal Representative for the Estate of DENNIS
SMITH; Oklahoma State Bureau of Investigation
Agents GARY ROGERS; RUSTY
FEATHERSTONE; JACKIE ROBERTS;  and
Pontotoc County District Attorney WILLIAM
PETERSON, in his individual capacity; BOARD
OF PONTOTOC COUNTY COMMISSIONERS;
and the STATE OF OKLAHOMA,

      Defendants.

**Civil Action No.**   21-cv-249-RAW

**<u>AMENDED COMPLAINT AND
JURY DEMAND</u>**

Plaintiff Karl Fontenot, by and through his attorneys Tiffany Murphy, Neufeld Scheck &

Brustin, LLP, and Doug Parr, hereby alleges as follows:

## I.    INTRODUCTION

1.    Karl Fontenot spent over 35 years in prison for a crime he did not commit: the

April 28, 1984 robbery of McAnally's convenience store in Ada, Oklahoma, and the kidnapping

1

and murder of McAnally's cashier Donna Denice Haraway ("Denice Haraway").

2.    Mr. Fontenot never should have been prosecuted for this crime. Although investigating officers from the Ada Police Department ("APD"), the Oklahoma State Bureau of Investigation ("OSBI"), the Pontotoc County Sheriff's Office, and the Pontotoc County District Attorney's Office botched the initial investigation into this horrible crime, destroying physical evidence at the scene and failing to follow up on obvious leads, they knew from the beginning that Mr. Fontenot did not match any description they had obtained of the likely suspect.

3.    Nevertheless, when over five months after Haraway's disappearance Defendants had made no arrests, facing mounting pressure Defendants focused on vulnerable suspects Karl Fontenot and Thomas ("Tommy") Ward, despite the lack of reliable evidence implicating them. Defendants first coerced and fabricated a false confession from Ward implicating Fontenot. Although this statement was obviously false and unreliable, Defendants used it as a basis to pursue the innocent Mr. Fontenot.

4.    Mr. Fontenot, a 20-year-old with an abnormally low IQ and post-traumatic stress disorder, was particularly vulnerable to Defendants' coercive tactics, and succumbed to their pressure. But because Mr. Fontenot was innocent, he knew nothing about the crime or the false story recounted by Ward. In order to give a false veneer of reliability to what was on its face a plainly unreliable confession, Defendants fed Mr. Fontenot nonpublic details and Defendants' theory of the crime and then falsely claimed Mr. Fontenot had volunteered this information. Within days, Mr. Fontenot truthfully recounted that he was innocent, and that he had only repeated the false story Defendants had fed him and pressured him to give.

5.    Defendants were soon presented with even more evidence that Mr. Fontenot was innocent, and that his statement was false and unreliable. For example, Defendants learned that

2

Mr. Fontenot had a credible alibi corroborated by other witnesses.

6.     Rather than recognizing Mr. Fontenot's innocence, Defendants engaged in even more misconduct to shore up their shaky case. Defendants withheld exculpatory evidence from the prosecutor and from defense counsel that would clearly point to alternate suspects, provide an alibi defense, undermine the accounts of prosecution witnesses, and otherwise absolve Mr. Fontenot. And they fabricated additional false evidence implicating him, including statements from jailhouse informants.

7.     As the 10th Circuit Court of Appeals later summarized, "Almost no evidence connected [Fontenot] to this crime other than his own videotaped confession, a confession that rang false in almost every particular." Nevertheless, based on evidence coerced and fabricated by Defendants, and without access to exculpatory evidence they suppressed, Mr. Fontenot was wrongly convicted and sentenced to death.  Just before sentencing, Mr. Fontenot told the Court to inform him when they find the people who did commit these heinous crimes. Mr. Fontenot went on to spend nearly 8 years awaiting execution by the State.

8.     Although his first conviction was overturned, Mr. Fontenot was prosecuted again based on the same evidence Defendants had fabricated, and without the same exculpatory evidence Defendants had suppressed. After his second conviction Mr. Fontenot continued to fight to demonstrate his innocence.

9.     Eventually, in 2019 the United States District Court for the Eastern District of Oklahoma (16-069-JHP-KEW) found that law enforcement agencies including Defendants had "repeatedly failed to disclose documents relevant to Mr. Fontenot's case for over twenty-five years" and that this withheld evidence both "prove[s] an alibi defense, and substantiate[s] proof of the ineptness of the police investigation." The District Court found "solid proof of Mr.

3

Fontenot's probable innocence" which overcame any procedural barriers to consideration of his claims of constitutional violations, given the overriding interest "to prevent a manifest injustice of the continued incarceration of one who is actually innocent." The Court further found "a clear pattern of police and prosecutorial misconduct that requires reversal of his conviction"— including chiefly the continued suppression of key exculpatory evidence. On August 21, 2019, the Court granted a writ of habeas corpus and vacated Mr. Fontenot's conviction. Mr. Fontenot was released from prison on December 19, 2019, pending appeal.

10.     On July 13, 2021, the Tenth Circuit affirmed both the findings that Mr. Fontenot had presented evidence of his actual innocence and that the suppression of exculpatory evidence had deprived him of a fair trial.  The Tenth Circuit concluded Mr. Fontenot's release was necessary "to prevent the further perpetuation of a fundamental miscarriage of justice."

11.     Mr. Fontenot now seeks justice and accountability for his 35 years of wrongful incarceration.

## II.     JURISDCTION AND VENUE

12.     This Court has federal-question jurisdiction over the claims arising out of violations of the United States Constitution, through 42 U.S.C. § 1983, under 28 U.S.C. §§ 1331 and 1343. It has supplemental jurisdiction over pendent state law claims under 28 U.S.C. § 1367(a).

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of Oklahoma, the judicial district in which the claims arose.

14.     Plaintiff has complied with the requirements of 51 Okl. St. Ann. § 156. Plaintiff made and served notices of claims against the City of Ada, Pontotoc County, and State of Oklahoma within one (1) year of August 21, 2019, the date the Eastern District of Oklahoma

*granted* Plaintiff's petition for writ of habeas corpus.

15.     Plaintiff has also complied with the requirements of 51 Okl. St. Ann. § 157. The City of Ada, Pontotoc County, and State of Oklahoma failed to approve the claims in their entirety within ninety (90) days.

16.      This action is related to Plaintiff's federal habeas case in which the Eastern District of Oklahoma granted a writ of habeas corpus and vacated Mr. Fontenot's conviction. *See Fontenot v. Allbaugh*, No. CIV 16-069-JHP-KEW (E.D. Ok. Aug. 21, 2019).

### III.     PARTIES

17.     Plaintiff KARL FONTENOT was wrongfully arrested, charged, prosecuted, tried, convicted, and imprisoned by the acts of the Defendants in this complaint. He is, and at all times relevant herein was, an individual residing in the State of Oklahoma.

18.     Defendant CITY OF ADA is a political subdivision of the State of Oklahoma and a municipal corporation, which was at all relevant times the employer of individual detective and sergeant Defendants of the Ada Police Department. The City of Ada is and was at all times relevant to this complaint officially responsible for the policies, practices, and customs of the APD.

19.     Defendant MIKE BASKIN was at all times relevant herein a duly appointed and acting Detective of the Ada Police Department acting under color of Oklahoma state law. He is sued in his individual capacity.

20.     Defendant Sandra Sue Smith is sued in her capacity as Personal Representative for the Estate of DENNIS SMITH, who was at all times relevant herein a duly appointed and acting Detective of the Ada Police Department acting under color of Oklahoma state law. This Defendant is referred to as DENNIS SMITH throughout the complaint and is sued in an

individual capacity.

21.     Defendant GARY ROGERS was at all times relevant herein a duly appointed and acting Agent of the Oklahoma State Bureau of Investigation acting under color of Oklahoma state law. He is sued in his individual capacity.

22.     Defendant RUSTY FEATHERSTONE was at all times relevant herein a duly appointed and acting Agent of the Oklahoma State Bureau of Investigation acting under color of Oklahoma state law. He is sued in his individual capacity.

23.     Defendant JACKIE ROBERTS was at all times relevant herein a duly appointed and acting Agent of the Oklahoma State Bureau of Investigation acting under color of Oklahoma state law. She is sued in her individual capacity.

24.     Defendant WILLIAM PETERSON was at all times relevant herein a duly appointed and acting District Attorney of Pontotoc County acting under color of Oklahoma state law. He is sued in his individual capacity.

25.     Defendant BOARD OF PONTOTOC COUNTY COMISSIONERS is a political subdivision of the State of Oklahoma and was at all relevant times the employer of the individual sheriff deputy Defendant of the Pontotoc County Sheriff's Office and the individual investigator and district attorney Defendants of the Office of the District Attorney of Pontotoc County.

26.     Defendant STATE OF OKLAHOMA is one of fifty states of the United States of America and was at all relevant times the employer of individual agent Defendants of the Oklahoma State Bureau of Investigation.

27.     At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiff of his constitutional and statutory rights.

28.     At all times relevant to this Complaint, all defendants acted under color of

Oklahoma state law.

## IV.    FACTS

### Denice Haraway mysteriously disappears from the convenience store where she was working and is presumed abducted.

29.     On Saturday, April 28, 1984, 24-year-old Denice Haraway disappeared from McAnally's gas station and convenience store in Ada, Oklahoma while working her usual evening shift as the cashier.

30.     At around 8:30 p.m. customers Gene Whelchel and David and Lenny Timmons arrived at the store and realized there was no cashier and that the register was left open. Recognizing something was wrong at 8:50 p.m. they called the police.

31.     Shortly beforehand, Haraway had been seen with a man who appeared to be a friend or boyfriend of hers behind the counter at McAnally's. The man was large, in his mid-20s, approximately 6 feet tall, and 200 lbs, with short, light hair and a full beard. He appeared unhappy or concerned. He drove a late 1970s model light-colored Chevy pickup truck with gray primer spots on the body.

32.     Whelchel and the Timmonses would later report that when they arrived around 8:30 p.m., they parked and saw a woman exit the store with a blond man. That man had his arm around the woman's waist when they entered a pickup truck and left the parking lot. The woman did not appear afraid, and the men noticed nothing unusual at the time.

33.     Gene Whelchel later identified Denice Haraway as the woman he saw leaving the store with the unknown blond man.

### Mr. Fontenot is actually innocent.

34.     Mr. Fontenot is innocent. He was not involved whatsoever in any crime against

Denice Haraway.

35.     Mr. Fontenot had no interaction with Denice Haraway, either that night or at any prior time. Mr. Fontenot was not present at McAnally's the night Haraway disappeared and had never before been inside of McAnally's.

36.     On the night of Haraway's disappearance, Mr. Fontenot was at an Ada house party in an apartment at 509 S Townsend Ave the entire evening. Several people corroborated his presence at the party, and the police also created reports during this event in response to noise complaints.

**Officers from the Ada Police Department arrived to investigate the disappearance.**

37.     When Ada police officers arrived on the scene, they found Haraway's books and purse containing her driver's license lying on the counter. There was also a cigarette burning in an ashtray which was positioned such that it must have been left by someone standing behind the counter—Denice Haraway did not smoke. The cash register was open, and after the manager of McAnally's arrived, he determined that $167 had been stolen. Haraway's keys were also behind the counter and her car was still parked on the side of the store.

38.     Shortly thereafter, Defendant Baskin arrived at McAnally's and filled out a missing person form. Baskin subsequently searched the area for Denice Haraway, though the search was unsuccessful.  Baskin also took the register tape from the store and documented the customers who came into the store at various times that evening.

39.     Several people were in the store when the police arrived, including children. The Ada Police did not secure the scene or gather any physical evidence. In the absence of any action by the Ada Police to collect evidence or secure the scene, all physical evidence was destroyed by the McAnally's manager who wanted to clean up the store. This destroyed evidence includes

fingerprints from the cash register, counter, glass doors, and the still-burning cigarette.

**Defendants ignore more likely leads to focus on suspects with tenuous connection to Haraway's disappearance.**

40.     After reviewing the register tape, Defendants Baskin and Smith began the process of interviewing customers who were in the store the night that Haraway disappeared. One of the customers that Defendant Baskin interviewed was John McKinnis, a frequent customer of McAnally's who made a purchase there less than thirty minutes before Haraway's disappearance.

41.     Upon learning of Haraway's disappearance, McKinnis called the police that same night and told Defendant Baskin that while he was in McAnally's, he saw a man he did not know behind the counter, just a few feet from Haraway. He further noted that Haraway appeared to know this man based on her behavior. McKinnis described this unknown man as being of a large build, standing at 5'10" to 6'1", 210 pounds, having light colored hair, and having a full beard. McKinnis gave a detailed description of the man he saw with Haraway and believed he could have identified him if shown photographs.

42.     McKinnis also described how there was a truck parked outside McAnally's at the time which appeared to belong to this unknown man. The truck was a Chevy pickup of the current body style (1977 or 1978) with lots of primer paint prep spots and a short, conventional truck bed.

43.     From living in the Ada area, McKinnis knew both Mr. Fontenot and Mr. Ward by sight. The man he saw with Haraway was someone unknown to him—i.e., *not* Mr. Fontenot or Mr. Ward. In addition, the detailed description McKinnis gave did not match the either Mr. Fontenot or Mr. Ward.

9

44.     McKinnis's information aligned with known details about the crime. For example, McKinnis's description of the man standing behind the counter was consistent with the cigarette found positioned as if left by someone behind the counter, which could not have come from Haraway, who did not smoke. Other witnesses reported seeing the same gray-primered pickup parked in the same location outside McAnally's both before and after McKinnis did.

45.     Although McKinnis was one of the last people to have seen Haraway before she went missing and described the unknown man he saw behind the counter in detail to Defendant Baskin, Baskin inexplicably failed to follow up on this key information from McKinnis. This exculpatory evidence was never turned over to the prosecution, nor to the defense.

46.     In addition to following up on the customers from McAnally's as identified by the register tape, Defendant Baskin also checked with nearby convenience stores, including JP's Pack to Go ("JP's") located less than half a mile away from McAnally's, and interviewed witnesses there. One of these witnesses was store clerk Karen Wise.

47.     Wise reported that on April 28, 1984, four men had entered JP's while she was working. Wise knew two of these men, who were named Bubba Daggs and Jim Bob Howard, and she was afraid of them because of the way they behaved. The men left and later returned to JP's around 7:00 p.m., where they stayed playing pool in the store's back room for approximately an hour and a half. Wise began to feel uncomfortable because she stated the men were watching her. She told her co-worker, Jack Paschall, about this incident, and Paschall also witnessed the men. When the men left, they drove off in a pickup truck in the direction of McAnally's.

48.     The following day, Defendant Baskin sent out a robbery and abduction alert to all police stations. Included in this alert was a description of two suspects believed to have taken

10

Haraway. For unknown reasons, Defendants based these suspect descriptions on Wise's description of two of the four men she had seen in JP's, rather than descriptions witnesses had given of suspicious men in McAnally's with Haraway (such as the description from John McKinnis of the man he saw behind the counter with Haraway half an hour before she disappeared). The suspect description was also based solely on the two unknown men Wise had seen *with* Bubba Daggs and Jim Bob Howard but omitted the descriptions of Daggs and Howard—who were the two men in JP's whose behavior had concerned Wise.

49.    On April 30, 1984, Wise met with Defendant Rogers to give a formal statement, and also met with a sketch artist to create composites of the two unknown men she had seen in JP's two nights before.

50.    Wise initially resisted participating in the creation of the composites because she had no information whether the two men she had seen in JP's had anything to do with Haraway's disappearance. She was also uncomfortable that Defendants were focused solely on the two men she did not know, instead of the two men whose behavior had concerned her—Daggs and Howard. But Defendants insisted they wanted composite drawings of the two unknown men, and so she complied. Defendants including Baskin and Rogers then buried Wise's truthful account of the number of men in JP's the night of Haraway's disappearance, and pressured Wise not to mention the other two men herself.

51.    Karl Fontenot was not present in JP's store the night of Haraway's disappearance. He was not one of the men Wise saw there. Neither of these composites resembles Karl Fontenot.

52.    Even though a number of witnesses—John McKinnis, Gene Whelchel, David Timmons, and Lenny Timmons—had all reported seeing Denice Haraway inside McAnally's or

leaving McAnally's with just *one* man, Defendants nevertheless focused their investigation on finding the *two* suspects Wise had described seeing at JP's.

53.    In addition, Defendants unreasonably focused on another person they interviewed, James Moyer, who reported going to McAnally's around 7:30 p.m. the day of Haraway's disappearance—or a full hour before she was reported missing. Unlike the witnesses who reported seeing Haraway closer in time to her disappearance, Moyer reported to Detective Barrett and Ada Chief Fox seeing two men (one dark haired and one blond) enter McAnally's while he was there. Moyer did not describe the men interacting with Haraway or doing anything suspicious. He also could not provide a detailed description of either man; he was only inside with them for a minute and would later admit he never got a good look at the dark-haired man. Finally, although Defendants apparently presumed Moyer had seen the same two men Wise and Paschal had described at JP's (and for whom composites were created) the timing of the accounts was fundamentally inconsistent; Moyer describes seeing two men at McAnally's at 7:30 p.m., but Wise described the men staying in the back room of JP's playing pool from 7:00 p.m. until approximately 8:30 p.m.

54.    Although Moyer's account was on its face far less significant than McKinnis's—McKinnis saw Haraway 30 minutes after Moyer reported doing so, the man McKinnis saw was behind the counter with Haraway and appeared to know her, and McKinnis could provide a far more detailed description than Moyer could—inexplicably Defendants followed up with Moyer as a witness but not with McKinnis. Defendants also later suppressed the exculpatory and impeaching statements from Moyer demonstrating his inability to make an identification.

**None of the witness descriptions of possible suspects match Mr. Fontenot's description.**

55.    John McKinnis, one of the last people to see Haraway in McAnally's less than

half an hour before she disappeared, described the man he saw behind the counter with Haraway as being of a large build, standing at 5'10" to 6'1", 210 pounds, with light colored hair and a full beard. Mr. Fontenot is short (approximately 5'7") and at the time had coal black hair and no beard. The description McKinnis provided was totally different from Mr. Fontenot. Indeed, McKinnis knew Mr. Fontenot by sight and the person he saw was not Mr. Fontenot.

56.   Gene Whelchel, David Timmons, and Lenny Timmons reported seeing Haraway leave McAnally's with one man. Whelchel described the man that Haraway left with as 5'8" tall and 150 pounds, with blond hair. David Timmons described the man as short and stocky, with blond hair. Lenny Timmons described the man as 5'8" with blond hair. These descriptions are also completely inconsistent with Mr. Fontenot, who had coal black hair, not blond hair.

57.   Defendants also focused on three "eyewitnesses" who gave descriptions of two potential suspects: Karen Wise and Jack Paschall, who had seen the men at JP's, and James Moyer, who reported seeing two men at McAnally's an hour before Haraway disappeared. These witnesses generally described a shorter man with blond hair, and a second, taller man with sandy brown hair. Neither of these descriptions matches Mr. Fontenot, either, as he is short and had coal black hair.

58.   In sum, none of the descriptions of possible suspects provided by seven separate witnesses were consistent with Mr. Fontenot's description.

**In addition to conflicting statements about the number of suspects, there were also conflicting statements regarding the pickup truck they allegedly drove.**

59.   In the official alert sent to all police stations on April 29, 1984 by Defendant Baskin, he described the vehicle that drove off with the unknown man and Denice Haraway as an early model Chevy pickup truck with light gray primer color.

13

60.     That was exactly the description of the vehicle John McKinnis had seen parked outside McAnally's around 8:00 pm, presumably belonging to the tall, bearded, light colored hair man he saw behind the counter with Haraway.

61.     Officer Richard Holkum, an off-duty Ada police officer who made a purchase at McAnally's between 7:45 to 8:00 pm, shortly before McKinnis, also described seeing the same vehicle in the same location: a Chevy or GMC pickup truck painted primer gray just outside of the store.

62.     Lastly, Duney Alford, another customer who made a purchase at McAnally's that evening and saw Haraway shortly before her disappearance spoke with Ada Chief Fox and described a pickup truck parked outside of the store that was chalky-gray colored.

63.     This is different than the description of the pickup seen by Karen Wise and Jack Paschall at JPs. Wise described the pickup as an older model, with possibly reddish-brown primer color, and a "jacked up" rear end. Paschall described the pickup as an older model Chevrolet with primer paint, and possibly a badly bent or missing tailgate.

64.     The pickup descriptions given by the other witnesses also varied, casting more doubt on whether they were describing the same vehicle.

   a.   Lenny Timmons described the truck as a green and gray, older Chevy pick-up that was not well maintained.

   b.   David Timmons thought the pick-up was blue, rough, dents on the side, with a white rear bumper that was possibly raised.

   c.   Gene Whelchel said the pick-up was full sized and light colored. He suggested it might be an early 1970s model, he was sure it was not a narrow bed.

   d.   Moyer described the pickup as a 67–69 light gray Chevrolet, rough looking, that may

have had a trailer hitch.

65.     Defendants were so desperate for a description of this pickup that they used ordinary detectives to hypnotize key witnesses in order to improperly elicit information. Two of these witnesses were David Timmons and Lenny Timmons, who were hypnotized by Defendant Roberts at the request of Defendant Rogers. This hypnosis corrupted the reliability of any subsequent statements from these witnesses who were ultimately used as prosecution witnesses at trial, yet information regarding these hypnosis sessions was intentionally withheld by Defendants, including in particular Roberts and Rogers from the prosecutor.

66.     Though these descriptions of the pickup varied, and in particular the description from the witnesses at JPs was distinctly different from that of witnesses at McAnally's, Defendants nevertheless centered their investigation around the theory that the same gray primered pickup had been first at JPs and then at McAnally's, and that Denice Haraway had left in that car the night of her disappearance.

**Based on the composites Defendants look at Tommy Ward but quickly move on.**

67.     In the first few days after the abduction, police fielded a number of calls reporting that the composite of Suspect #2, the shorter man with blond hair, resembled longtime Ada resident Tommy Ward.

68.     On May 1, Defendant Smith spoke to Ward, who reported on Saturday, April 28 he had gone fishing with his friend Karl Fontenot and that that evening the two of them had gone to a house party in an apartment at 509 S Townsend Ave.

69.     Defendants took photos of Ward to show to witnesses but then released him.

70.     That same day, May 1, two APD detectives confronted Fontenot outside his home and said they wanted to talk to him about what he had Ward had done on April 28. Fontenot told

them he was on his way to work but could talk to them later. Neither Fontenot nor the police ever followed up on this at the time.

71.     Fontenot did not resemble either of the composites and the police never received any tips implicating him. Fontenot was not contacted by the police again for months.

**Defendants fail to investigate promising leads, and the investigation stalls.**

72.     Over the course of their investigation, Defendants developed many leads and collected information about various individuals who might have been involved in Denice Haraway's disappearance. Defendants not only failed to conduct obvious follow up investigation on these leads, but ultimately hid many of them from the prosecution and defense as their investigation later focused on a prosecution of Karl Fontenot and Tommy Ward. Due to their neglect, we may never know who was responsible for the troubling events that transpired on April 28, 1984.

73.     For instance, in the weeks leading up to Haraway's disappearance, she received numerous obscene phone calls while working at McAnally's. This unknown caller only contacted Haraway while she was at work, and Haraway became so frightened that she told a frequent customer she wanted to purchase a gun. Defendants did not conduct further investigation to determine the identity of the person harassing Haraway.

74.     Also, there was evidence of a Vietnam veteran harassing Haraway, which both Haraway's husband and the manager of McAnally's verified. The manager of McAnally's was even able to identify that the veteran likely attended a rehabilitation school in a neighboring county. Defendants did not further investigate this information and never obtained the identity of this man harassing Haraway.

75.     Two months after Haraway's disappearance, three men attempted to steal a

woman's purse, and then tried to run over the owners after being caught. These three men, Denver Russel Davis, Daryl Patrick Robins, and Christopher Lynn Hammock, drove a pickup with Oklahoma license plates, and they had a history of robbery, larceny, dangerous drugs and assault. Defendants learned of these men after they had been arrested for the purse snatching in Texas, as the arresting detectives believed one of them resembled the suspect in the composite. Defendants did not conduct further investigation to determine the whereabouts of the three men on April 28, 1984.

76.     Another set of suspects who Defendants should have investigated were Orvel Reeves and Dennis Reeves, two brothers who robbed a female convenience store clerk at knife point and then abducted her from the store at which she worked. This incident occurred approximately three months after Haraway's disappearance. Not only did the details of the Reeves brothers' crime closely track what happened to Haraway, but the brothers also matched the composite description used by the police. Although the brothers were in custody at the time, Defendants failed to conduct further follow-up.

77.     Perhaps most unexplainable is Defendant's investigation into Floyd DeGraw, which they ultimately dropped despite an abundance of evidence pointing to DeGraw's involvement.  Just five days after Haraway's disappearance, DeGraw was arrested in Texas for raping a woman and leaving her in a field naked. DeGraw had a lengthy criminal history and had numerous prior convictions, and is in fact currently serving a life sentence for stabbing a woman to death. After being arrested in Texas for rape, police searched DeGraw's car only to find pornographic materials depicting violence against women, jewelry and other belongings of women from cities in Oklahoma, and even a stolen driver's license from a woman in Ada, Oklahoma.

78.     The most troubling part of the Defendants' investigation into Degraw is that every part of his story was verified to be false.  After receiving information about DeGraw from police in Texas, Defendant Rogers began investigating. When questioned about his whereabouts during Denice Haraway's disappearance, DeGraw relayed a story that later proved to be questionable and untruthful. DeGraw was also given a polygraph examination, and most of his answers to questions regarding his involvement in Haraway's kidnapping were marked as deceptive.

79.     Not only did DeGraw have a history of physical and sexual violence towards women, but he also had mental issues and was in fact institutionalized at one point, noting his tendency to "fly off the handle." Although DeGraw continued to tell lies about his whereabouts, had ties to Ada, Oklahoma, and even looked similar to the suspect in the composite drawing, Defendants inexplicably dropped their investigation into DeGraw.

**After months of investigation with no arrests, Defendants grasp onto unreliable information from informant Jeffrey Miller.**

80.     With all promising physical evidence destroyed, differing accounts of the number of suspects, inconsistent statements regarding the alleged getaway car, and no body, Defendants' investigation had stalled. Due to their own negligent errors and shoddy investigative work, by five months after Haraway's disappearance Defendants had made no arrests and were nearing a dead end. Enter an informant named Jeffrey Miller, who gave Defendants' floundering investigation a new focus.

81.     In the late summer or early fall of 1984, Defendants Smith and Baskin interviewed an inconsistently employed local man, Jeffrey Miller, several times.  While some of these interviews were reportedly audio and video recorded, neither these recordings, nor any written statements by Jeffrey Miller, have ever been disclosed, even though the police have

18

acknowledged possessing this information.

82.     Defendants Smith and Baskin reported that Miller provided information implicating Tommy Ward and Karl Fontenot in Haraway's disappearance—two men whose name had come up very early on (Ward because he reportedly looked like one of the composite drawings, Fontenot only because Ward had mentioned his name when interviewed)—but who Defendants had quickly determined at that point did not merit further investigation. Miller also provided information implicating a third local man Defendants had reason to suspect, Odell Titsworth, who had a criminal record.

83.     Neither Mr. Fontenot nor Ward had ever met Miller, and they did not know him.

84.     It is still unknown exactly what Miller said to Defendants Smith and Baskin or how this information implicated Mr. Fontenot, Mr. Ward, and Mr. Titsworth.

85.     At least some of the information Miller provided implicating Mr. Fontenot and Mr. Ward was quickly proven false. Nonetheless, Defendants relied on the information from Miller to guide their investigation.

**Tommy Ward is arrested and coerced into making a fabricated statement.**

86.     After talking to Miller, on October 12, 1984, Defendants Baskin and Smith questioned Ward. Although he denied kidnapping Haraway, Ward now gave a slightly different account of his whereabouts on April 28, 1984; he still described going to the party and staying there all evening (the time of Haraway's disappearance) but described working on his mother's plumbing with his brother-in-law during the day, instead of going fishing with Mr. Fontenot. Ward agreed to take a polygraph test the following week.

87.     On October 18, 1984, Ward went to OSBI headquarters in Oklahoma City for a polygraph. Before the polygraph and interrogation, Defendant Smith told Ward if he consulted a

lawyer it would make him a suspect, and they would seek the death penalty against him. As a result, Ward went to the polygraph and interrogation unrepresented.

88.     Although Ward's purpose was to clear his name, and he repeatedly told Defendants that he was innocent, and that he did not know anything about Haraway's disappearance, Defendants refused to accept that response.

89.     Instead, Defendants Rogers, Smith, and Featherstone coercively interrogated Ward for over nine hours. Defendants Rogers, Smith, and Featherstone did not permit Ward to eat, have a beverage, use the restroom; or smoke a cigarette during the nine-hour interrogation. In particular, Dennis Smith threatened Ward with physical harm, saying "I think we should take him out and shoot him."

90.     Under continuous pressure to provide information about the Haraway disappearance, Ward volunteered vague details about a dream he had had after he was questioned about Haraway's disappearance the week before. Defendants glommed on to this nebulous "dream" and repeatedly pressured Ward to turn it into a detailed confession. During this nine-hour interrogation, Defendants Rogers, Smith, and Featherstone fed details to Ward that aligned with the facts they knew to be true, as well as their theories of the crime, and relentlessly pressured Ward to adopt this information and incorporate it into his statement. This improper suggestion and fed-information included the type of blouse Haraway was wearing at the time of her disappearance (which both Ward and Haraway's sister described as a button-up blouse with blue flowers, lace around the collar, and elastic on the sleeve), how the crime occurred, and the names of two men who Defendants suggested were Ward's accomplices: Odell Titsworth and Karl Fontenot.

91.     Defendants then falsely represented that the information in Ward's statement—

including nonpublic facts about the crime—were volunteered by Ward, when they had actually been fed by Defendants.

92.     Ultimately, Defendants' coercive and manipulative tactics were successful, and Ward gave a videotaped statement confessing to the crime, incorporating the details fed to him by Defendants, including their suggestion of alleged accomplices: Odell Titsworth and Karl Fontenot.

93.     Ward's false confession asserted that, after being at a party, Ward, Odell Titsworth, and Mr. Fontenot drove to McAnally's in Titsworth's truck. After arriving at McAnally's, Titsworth grabbed Denice Haraway, took money from the cash register, and brought Haraway back to the pickup. They then drove to the power plant, where the three men took turns raping Haraway. Ward described that Haraway died from being repeatedly stabbed by Titsworth's lock-blade knife.

94.     This confession was completely false. For example, neither Mr. Fontenot nor Titsworth were involved in any way in Haraway's disappearance, and neither Ward nor Mr. Fontenot even knew Titsworth. Nor was Haraway stabbed.

95.     Ward's confession also included details Defendants knew at the time to be inconsistent with the evidence. For example, Ward described a struggle inside the McAnally's store where Haraway had been abducted, including throwing "potato chips and stuff that was on the aisle" and pushing Haraway around the counter. But there was no evidence in McAnally's of items on the floor or thrown about, and police had contemporaneously reported no evidence of a struggle at the scene. In addition, the witness accounts from Gene Whelchel and the Timmonses described Haraway leaving with one person, not two, and not seeming to be afraid or struggling.

96.     Defendants also pressed Ward to direct them to Haraway's body. In response to

Defendants' pressure, Ward volunteered three successive locations for Haraway's body:

    a.  a substation at the power plant west of Ada, Oklahoma (where the confession claimed Haraway had been taken and raped)

    b.  a house that had been burned down about a quarter mile from the substation

    c.  a concrete bunker located north of the burned house

97.    While the interrogation was ongoing Defendant Baskin searched each of these locations, and quickly proved that the information Ward provided in response to Defendants' Rogers, Smith, and Featherstone's coercive tactics was false, as Haraway's remains were not found in these locations. Defendants Rogers, Smith, and Baskin went so far as to bring Ward with them to the power plant to search for Haraway's body, which they still did not find. However, this did not deter Defendant Baskin from physically assaulting Ward and threatening him with the death penalty after Ward repeatedly told Defendant Baskin that he had no information on what happened to Haraway, or her whereabouts.

98.    Defendants Baskin, Smith, Rogers, and Pontotoc District Attorney Investigator Bond went on to interrogate Ward several other times on different days. On at least one of these occasions, Defendants Smith and Baskin brought human bones to Ward's cell to coerce him into revealing the location of Haraway's body. These interrogations did not bring forth any reliable evidence connecting Ward or his supposed accomplices to the crime.

99.    Although it was obvious to Defendants that Ward was unreliable and simply repeating details about the crime that they had fed to him, they nevertheless pursued Mr. Fontenot as a suspect after Ward falsely implicated him.

**Defendants fabricate a false confession from Karl Fontenot.**

100.    After he was falsely implicated in Ward's coerced and fabricated confession the

day before, Defendants arrested Mr. Fontenot on October 19, 1984.

101.    Mr. Fontenot is someone who could be easily manipulated. At the time, Mr. Fontenot was 20 years old, intermittently homeless, and suffering from post-traumatic stress disorder as a result of witnessing his mother's tragic death when she was struck by a car in front of him—an accident for which Mr. Fontenot unreasonably blamed himself. Mr. Fontenot was particularly vulnerable to Defendants' coercive tactics as he had an I.Q. estimate of 70 or less, placing him in the range of mental retardation or borderline mental retardation.  After completing an intelligence test conducted by psychiatrist Dr. Dreyer, it was determined that Mr. Fontenot got every answer wrong. In addition, Mr. Fontenot had no prior experience with the criminal justice system or with interrogation; he had never before been arrested. As a result of both his mental deficits and his inexperience, Mr. Fontenot lacked basic understanding of the criminal process or the adversarial roles of the police and prosecutors.  At one point he believed Assistant District Attorney Chris Ross was his own attorney.

102.    Mr. Fontenot was fairly well-known in the small community, as it was common knowledge that he was homeless and that his mother had died in a tragic car accident. Mr. Fontenot also had a reputation as someone who would "spin yarns" in order to receive attention. These mental, psychological, and social vulnerabilities were evident to Defendants during the interrogation and were intentionally used to their advantage.

103.    Although Mr. Fontenot repeatedly told detectives the truth—that he was innocent, had no involvement in the Haraway disappearance and didn't know anything about it— Defendants refused to accept this response. Defendants Rogers and Smith told Mr. Fontenot that they already knew what happened because Ward had confessed to it. Mr. Fontenot was intimidated by Defendants' aggressive tactics and eventually agreed to repeat the story they fed

to him to get Rogers out of his face. Due to his mental deficits, Mr. Fontenot did not understand the legal implications of making this statement—which he later referred to as a "confessment."

104.    Mr. Fontenot is innocent, had no involvement in the crimes against Haraway and no nonpublic knowledge about how they occurred. Nor did he know before Defendants interrogated him of the false story Tommy Ward had given implicating him, including that the two men had allegedly raped and murdered Haraway together with Odell Titsworth.

105.    As they had with Ward, Defendants Rogers and Smith fed Mr. Fontenot details about the crime and falsely claimed that those details originated with Mr. Fontenot. These details—both those that matched Ward's confession and Defendants then-theory about the crime and those that reflected nonpublic information about the crime—were used to falsely suggest the statement was reliable. Although Mr. Fontenot's confession was video recorded, Defendants intentionally did not record the nearly 2 hours of interrogation that preceded it.

106.    Mr. Fontenot's videotaped confession repeated the story Rogers and Smith had fed to him off-tape. Because Mr. Fontenot was innocent, had no nonpublic information about the crime, and did not know what Ward had falsely confessed to before he was interrogated by Rogers and Smith, Mr. Fontenot was not—and could not have been—the source of the details in his confession that matched Ward's false confession. Rather, this information was all fed by Defendants.

107.    Key details in Mr. Fontenot's confession that aligned with the details in Ward's include the following:

a.   That after being at a party, he, Ward, and Titsworth left in Titsworth's truck and drove to McAnally's.

b.   Titsworth took Denice Haraway from the store, took money from the register, and

brought Haraway back to his pickup.

c.  At the time, Haraway was wearing a buttoned shirt with ruffles around the collar.

d.  They all drove to the power plant and took turns raping Haraway.

e.  Haraway died after suffering from multiple stab wounds from Titsworth's lock-blade knife.

108.  Though many details in Mr. Fontenot's confession and Ward's confession aligned, Mr. Fontenot included additional details about what happened to Haraway that Ward did not. He claimed that after Haraway died from being stabbed, she was then placed inside a house which he, Ward, and Titsworth set on fire. This all proved to be false.

109.  Defendants did not employ any safeguards to ensure that Mr. Fontenot understood his Miranda rights before he gave the videotaped statement, and given his mental deficits he did not.

**The details in Mr. Fontenot's confession were consistent with Defendants' knowledge of the crime and their working theory at the time.**

110.  Because Mr. Fontenot had nothing to do with the crime, he had no unique knowledge of how the crime occurred. It was Defendants Rogers and Smith who fed Mr. Fontenot the specific details in Mr. Fontenot's confession, as these were facts already known to the police. In particular, these facts included:

a.  That the perpetrator stole approximately $150 of cash from the register (which police knew the night of Haraway's disappearance because the manager of McAnally's confirmed how much was missing).

b.  That Denice Haraway was wearing a short-sleeved shirt with ruffles and elastic (though Defendants denied they had a clothing description before taking the coerced

confessions, Defendants Baskin and Smith were informed of the blouse's description by a fellow police officer just one day after Haraway's disappearance. Defendants received similar descriptions of the blouse from other witnesses, and even from Denice Haraway's sister, before taking the coerced confessions.)

c.   That Denice Haraway was wearing tennis shoes (which police knew shortly after April 28, 1984, after speaking with Haraway's mother).

d.   That Denice Haraway left McAnally's in a pickup truck (which police knew the day of her disappearance after speaking with three witnesses).

111.   Defendants Rogers and Smith also fed Mr. Fontenot details about the crime consistent with their working theory at the time. These details were otherwise not known to the public nor Mr. Fontenot as he was innocent. Specifically, these details included that Mr. Fontenot, Ward, and Titsworth drove to McAnally's in Titsworth's truck; Odell Titsworth robbed McAnally's; that Titsworth then grabbed Haraway and brought her back to his pickup truck; the three men drove to a power plant where they took turns raping Haraway; and finally that Haraway was stabbed to death and then placed in an old home which was set on fire. Investigation would soon confirm that these details were false.

112.   Defendants Rogers and Smith then falsely represented that they did not provide *any* information about the crime or the details of Ward's confession to Fontenot, and that he had volunteered all this information himself. This fabrication was used to falsely suggest Fontenot's confession was reliable, despite the many obvious flaws with it. Defendants Rogers and Smith similarly claimed they never threatened or coerced Fontenot in any manner.

**Almost immediately after the videotaped statement is taken from Fontenot, Defendants obtain additional evidence that is false and unreliable.**

113.   Just three days after giving this videotaped statement, on October 21, 1984, Mr.

26

Fontenot made a handwritten statement detailing that he only agreed with the story Defendant Rogers told him, and that he lied while being video recorded. On that same day, Mr. Fontenot had a conversation with Defendant Featherstone and explained that he was innocent, that he had been at a party the night of Haraway's disappearance, and that he had never been inside McAnally's. He further explained that the detectives had told him what to say and he had simply agreed to it. Mr. Fontenot continued to truthfully maintain his innocence from that point forward.

114.    In addition, investigation quickly showed that all information that Mr. Fontenot himself provided in response to Defendants' pressure was either false or could not be corroborated. That Mr. Fontenot was unable to provide any reliable non-public facts about the crime was an independent indicator that he was not the true perpetrator, and that his confession was false.

115.    For example, on October 21, 1984—the same night that Mr. Fontenot told Defendant Featherstone that he was innocent and that his confession only repeated what Defendants had fed to him—Defendant Smith tried to get Mr. Fontenot to identify Odell Titsworth, the man whose alleged role in the Haraway rape and murder he had described in detail, from a photo lineup. Mr. Fontenot could not do so. In his recorded statement, Fontenot had been unable to describe what Titsworth looked like; he falsely stated he had hair "a little below his ears" and no visible tattoos, when in actuality Titsworth had hair down to the middle of his back and numerous tattoos up and down both arms. Finally, when Fontenot was taken to jail to identify Titsworth in person he could not do that, either. Defendant Smith determined that Mr. Fontenot did not know Mr. Titsworth—meaning that a central portion of the confession was false, and merely mirrored what Defendants Smith and Rogers had instructed Fontenot to say. Mr, Fontenot again told Defendant Smith that his confession was a lie and that he was not

involved in the crime.

116.    It was similarly apparent that Mr. Ward didn't know Odell Titsworth, either. Mr. Ward misstated Titsworth's last name as "Titsdale" six times during his videotaped statement and could not recall his first name without prompting from Defendant Smith.

117.    Additional evidence proved this portion of the videotaped statement was false. In the tape-recorded statement, Mr. Fontenot claimed that Odell Titsworth grabbed Denice Haraway from McAnally's, forced her into his truck, held Haraway down while the others raped her, and finally carried Haraway over his shoulder to transport her to an old house before burning it down. Detectives soon learned that Titsworth could not have carried out these actions because just two days before Haraway's disappearance, his arm was broken by APD officers. His injury was so severe and painful that it would have been impossible for him to have the strength necessary to carry Haraway, who weighed 110 pounds. Further, on the night of Haraway's disappearance, Titsworth was home with his girlfriend and her mother the entire evening.

118.    Mr. Fontenot's videotaped statement claimed Haraway had been abducted in Mr. Titsworth's truck. But neither Mr. Titsworth, nor his family, owned a pickup truck that matched the police's description of the vehicle. Defendants examined a pickup truck owned by Mr. Titsworth's mother and found no evidence it had been used in the crime. After Defendants interrogated him, Titsworth was eventually cleared of any wrongdoing in Haraway's disappearance. He was never charged.

119.    In the taped statement, Mr. Fontenot claimed that Titsworth had walked Ms. Haraway out of McAnally's into the waiting pickup truck. But eyewitness accounts describe a woman meeting Haraway's appearance leaving with a blond man—inconsistent with Titsworth (or Fontenot). Furthermore, Mr. Fontenot's statement claimed that Mr. Fontenot and Ward were

waiting by the pickup truck, but the witnesses saw no one else near the pickup. Mr. Fontenot also incorrectly described the orientation of the pickup truck.

120.    In the taped confession, Mr. Fontenot stated that after grabbing Denice Haraway from McAnally's, the three men drove to a power plant where they took turns raping her. On October 19, 1984, the powerplant was searched, but. Haraway's body was not found. Although Defendants repeatedly tried to locate Haraway's remains at the power plant and surrounding areas, they were unsuccessful in finding her remains or any items that would corroborate this story. Defendants never obtained any evidence that a rape had occurred, and the State eventually dismissed the rape charge against Mr. Fontenot.

121.    At some point in late October 1984, out of frustration that neither Fontenot nor Ward was able to volunteer any accurate information about the crime or where the body was located, Defendants Smith and Baskin obtained a sack of bones from East Central University, including a human skull. Defendants Baskin and Smith brought these bones to the county jail and showed them to Mr. Fontenot and Mr. Ward, in an attempt to intimidate them into providing the location of Ms. Haraway's body. But they were unable to do so because they did not know it. While, in response to this pressure, Mr. Fontenot and Mr. Ward suggested additional places to search for Haraway's body, none led to its discovery.

122.    In his taped statement, Mr. Fontenot stated that after Haraway died, her body was placed in an old home near the powerplant, and that the home was set on fire with Haraway inside. In a search on November 1, 1984, Defendants found that the house Mr. Fontenot claimed to have burned with Haraway's body inside—but not only was there no body inside it, the house had burned in 1983, a year before her disappearance.

123.    Defendant Baskin admitted that he was not able to ascertain as the truth anything

that Mr. Fontenot told him. Defendant Rogers admitted that Mr. Fontenot's statements about
what happened to Haraway's body were proven false.

**Defendants were presented with reliable evidence that Mr. Fontenot was at a party during**
**the time of Denice Haraway's disappearance.**

124.    On April 28, 1984, Mr. Fontenot attended a house party at 509 S Townsend Ave.
He did not leave the party until after midnight, which was hours after Denice Haraway
disappeared from McAnally's.

125.    Ada Police Department and Oklahoma State Bureau of Investigation Defendants
were aware of this party, as there were several witness reports, dispatch records, and police
reports created in response to this loud event.

126.    On October 21, 1984, just days after Defendants obtained the videotaped
statement from him, Mr. Fontenot truthfully told Defendant Featherstone that he was innocent, of
his whereabouts the night of Haraway's disappearance, and that he had never been to
McAnally's. In turn, Defendants collected several statements from witnesses who corroborated
Mr. Fontenot's alibi. Instead of clearing Mr. Fontenot of any wrongdoing, or at the very least
providing this information to Mr. Fontenot's counsel, Defendants pressured witnesses to recant
their truthful testimony.

127.    Mr. Fontenot also wrote letters to his trial attorney, George Butner, detailing this
party and affirming that he was innocent and not responsible for Haraway's disappearance. Mr.
Fontenot stated in one of these letters that he only confessed on video to get Defendant Rogers
out of his face. Also in these letters were several names of people who did provide affidavits and
statements verifying his attendance at the party the entire night of April 28, 1984.

128.    Although these letters were intended to go to Mr. Fontenot's attorney, George

Butner, Defendants including Ada Detectives Baskin and Smith intentionally never gave these letters to Butner, instead reading them in violation of the attorney client privilege and Mr. Fontenot's right to counsel, using the information from those letters in their own investigation, hiding the exculpatory information they uncovered, and generally impeding Mr. Fontenot's ability to put on a defense.

129.     Rather than exclude Mr. Fontenot as a suspect, Defendants buried exculpatory evidence of his alibi from the prosecutor, and they knowingly pursued an innocent man for crimes he could not have committed.

130.     In early November of 1984, weeks after being arrested and held in jail, Defendants charged Mr. Fontenot with four counts of robbery, kidnapping, rape, and murder.

**Defendants fabricate statements from two unreliable jailhouse snitches who claim to have heard Mr. Fontenot implicate himself in Haraway's disappearance.**

131.     At this point, Defendants had a patently unreliable statement from an extremely vulnerable witness, which had been disproven in many key details, no physical evidence, no body, and no eyewitnesses implicating Mr. Fontenot.

132.     To bolster their weak case against Mr. Fontenot, Defendants fabricated statements from Leonard Martin and Terri Holland—two jailhouse snitches who claim to have heard Mr. Fontenot make self-incriminating statements.

133.     In October of 1984, Martin was in Pontotoc County Jail for driving while under suspension. While sweeping the floors one afternoon, Martin claimed to have heard Mr. Fontenot say to himself "I knew we would get caught." This is false; Mr. Fontenot never said this, as he was innocent and proclaimed his innocence multiple times.

134.     Upon information and belief, Investigator Bond interviewed Martin and procured

Martin's statement through misconduct. In return, Investigator Bond made promises of leniency on Martin's sentence. These promises were not made known to Mr. Fontenot's trial attorney, George Butner.

135.    Terri Holland was also serving time in Pontotoc County Jail with Mr. Fontenot after receiving a five-year sentence for fraudulent checks. Holland was a habitual liar and repeat "jailhouse snitch" who falsely implicated several different people for personal gain. Holland spoke with Martin and was strategically placed in a cell directly across the hall from Mr. Fontenot.

136.    On October 19, 1984, the same day that Mr. Fontenot was arrested, Holland claimed to have heard Mr. Fontenot confess to the crime. Upon information and belief, Defendant Peterson, Defendant Rogers, Investigator Bond and Sheriff Deputy Turner fed Holland non-public details about the crime, including the theories they had believed at the time to be true, and falsely reported that those details originated with Mr. Fontenot. Holland falsely claimed that Mr. Fontenot stated the following

   a.   That he, Odell Titsworth, and Tommy Ward went to McAnally's, where Titsworth and Ward took Denice Haraway.

   b.   After taking Haraway, the men took turns raping her.

   c.   Denice Haraway was stabbed to death by Titsworth.

   d.   Haraway's body was then placed in the floor of an old house, and the three men poured gasoline on her and burned her.

137.    Mr. Fontenot is innocent and had nothing to do with Haraway's disappearance. He never made these statements to Holland.

138.    Though Holland testified at Mr. Fontenot's preliminary hearing that she had not

received any benefits in exchange for her testimony, this was proven to be false.

139.    Terri Holland's husband, Randy Holland, signed an affidavit stating that in exchange for Terri's testimony, Randy would be given a reduced sentence on his own pending case, and he would be allowed to marry Terri Holland while he was incarcerated. Holland admitted that she got married in between Mr. Fontenot's preliminary hearing and trial.

140.    Defendants utilized Holland to create a false case of probable cause against Mr. Fontenot because they knew she had a history of lying, as evidenced by her criminal history of forgery and writing fraudulent checks, and they also knew she had previous experience in being a snitch.

141.    In a separate murder case involving a man named Ron Williamson, Holland claimed to have heard Williamson implicate himself in the murder of Debbie Carter. Like Mr. Fontenot, the Pontotoc County District Attorney's office used Holland's testimony to bolster their case. Holland's testimony in the Williamson case proved to be false, and Williamson was later exonerated.

**Witnesses are unable to make a positive identification of Mr. Fontenot from lineups.**

142.    Although Mr. Fontenot did not resemble any of the many descriptions witnesses had given of suspects they had seen, after Defendants coerced and fabricated evidence implicating Mr. Fontenot, they attempted to get witnesses to identify him.

143.    Defendant Rogers and Ada Chief Fox conducted a lineup with Mr. Fontenot on December 11, 1984, at 7:24 p.m. The first witness to step into the viewing room was Jack Paschall. After viewing all the men in the lineup, including Mr. Fontenot, Paschall told Defendants he could not be of any help. He did not make an identification of Mr. Fontenot.

144.    Defendant Rogers and Ada Chief Fox then brought Karen Wise into the viewing

room minutes later. She told Defendant Rogers at the time of the lineup that she could not identify any of the men.

145.    Even though Wise had not identified anyone from the lineup—and even though Mr. Fontenot not only was not one of the people Wise saw in JP's but also did not resemble either of the people Wise saw—Defendant Smith reported that, after the lineup, Wise called to tell him that one of the people in the lineup looked familiar, although she still could not be sure that person was in JP's the day of Haraway's disappearance. On information and belief, this later statement was the result of improper suggestion and coercion by Defendants to identify Fontenot. In any event, even in this later statement Wise did not identify Mr. Fontenot.

146.    The last lineup that Defendant Rogers and Ada Chief Fox conducted that evening was with James Moyer. Moyer had initially provided only a vague description of two men he saw in the store an hour before Haraway's disappearance—but neither matched Mr. Fontenot. A month before the lineup, Moyer gave a different account of what he had seen, and made clear he never got a good look at the dark haired man in McAnally's who had been at the back of the store when he was inside. At that time Defendants showed Moyer picture lineups for at least Ward and Titsworth, and Moyer selected photos from each of those lineups as the person most resembling the men he had seen in the store, but that he couldn't make an identification. Moyer did not identify anyone from any photo lineups of Fontenot—either because he was shown photos including Fontenot and did not make any selection, or because Defendants did not even show him a photo lineup including Fontenot.

147.    Despite this consistent evidence that Moyer had not seen Fontenot at McAnally's, on December 11, 1984, Defendants had Moyer view a lineup of Fontenot. Before conducting this lineup procedure, Moyer underwent hypnosis. After improper suggestion and coercion by

34

Defendants, Moyer made an identification of Mr. Fontenot, the innocent man Defendants suspected—even though Moyer had not seen Mr. Fontenot in the store, and had never had a good look at the dark haired man he had seen.

148.    This false identification was the only identification ever obtained placing Fontenot in McAnally's near the time of Haraway's disappearance. Defendants never disclosed to the prosecution or defense the earlier statements from Moyer providing inconsistent statements to his later account and making clear his inability to identify Fontenot.

149.    Moyer later told both an investigator and the district attorney's office that Mr. Fontenot was not the person he saw in McAnally's on April 28, 1984.

150.    Upon information and belief, Defendants Rogers and Smith either used direct or indirect suggestion to procure the misidentification of Mr. Fontenot by both Karen Wise and James Moyer, and/or the identifications were fabricated by Defendants.

151.    Although John McKinnis saw a man with Haraway less than half an hour before she disappeared, provided a more detailed description than Moyer, and believed he would be able to identify the man he saw, he was never asked to view photographs or a lineup. Had he done so, he would have told Defendants that neither Mr. Fontenot nor Mr. Ward were the man he saw, as he knew them by sight and the person he saw was unknown to him.

**Tommy Ward testifies in a closed hearing on January 5, 1985, and completely exculpates Mr. Fontenot.**

152.    In a closed hearing with the trial judge, defense counsel, and several representatives from the prosecution and law enforcement present, Ward testified under oath that Mr. Fontenot had no knowledge of the circumstances leading up to Denice Haraway's disappearance, nor did he in any way participate in these events.

35

153.     Ward further stated that the only reason he falsely implicated Mr. Fontenot and Odell Titsworth in his original confession was due to Defendant Smith's improper suggestion and coercion.

154.     The only reason Mr. Fontenot was arrested on October 19, 1984, was because Defendants coercively interrogated Ward the previous day for several hours, ultimately forcing Ward to cave under pressure and falsely implicate Mr. Fontenot.

**To sustain an extremely weak case, Defendants hide evidence exculpating Mr. Fontenot from the prosecution and defense.**

155.     Defendants worked to force bits and pieces of evidence together into a barely coherent story just to close their case. There was an incredible amount of evidence pointing to alternate suspects that Defendants could have explored, and some of these suspects were even in police custody at the time for committing crimes eerily similar to what police believed happened to Haraway. However, not only did Defendants fail to thoroughly investigate these leads, but they also buried information about their investigation into alternate suspects from both the prosecution and defense.

a.   For example, Defendants never provided any information about the statement from John McKinnis about the man he observed behind the counter with Haraway to the prosecution.

b.   Further, in the weeks leading up to Haraway's disappearance, she received numerous obscene phone calls while working at McAnally's. This unknown caller only contacted Haraway while she was at work, and Haraway became so frightened that she told a frequent customer she wanted to purchase a gun. Defendants never gave the prosecution reports detailing witness accounts of Haraway's statements to them

regarding these calls.

c.   Defendants also chose not to continue investigating, nor divulge any information to the prosecution or defense regarding the following suspects: (1) Orvel Reeves and Dennis Reeves, two brothers who robbed a female convenience store clerk at knifepoint, and then abducted her from the store at which she worked approximately three months after Haraway's disappearance; (2) the Vietnam veteran harassing Haraway, who both Haraway's husband and the manager of McAnally's verified; (3) Jerry East, who was arrested for burglary and on probation at the time of Haraway's disappearance; and (4) Denver Russel Davis, Daryl Patrick Robins, and Christopher Lynn Hammock, three men who attempted to steal a woman's purse, and then tried to run over the owners after being caught. These three men had a history of robbery, larceny, dangerous drugs and assault.

156.   Along with hiding exculpatory information regarding alternate suspects, Defendants also hid impeachment evidence of inconsistent statements given by prosecution witnesses. For example, Defendants withheld reports from two police interviews with James Moyer, in which he gave two inconsistent descriptions of the men he saw in McAnally's the night of Haraway's disappearance, and also made clear he never got a good look at the man in the back of the store, who he later identified as Mr. Fontenot.

157.   Moreover, Defendants hid exculpatory evidence of Mr. Fontenot's alibi from both the prosecution and defense. Mr. Fontenot wrote several letters to his attorney, and contained in some of these letters were the names of people who Mr. Fontenot stated would verify that he was at a house party during the time of Haraway's disappearance. Defendants investigated many of these witnesses and created reports detailing their follow up, and they even had police reports

created during the time of the party in response to noise complaints. Though this information was all corroborated and could have exculpated Mr. Fontenot, Defendants never turned this information over to the prosecution or defense.

158.   In sum, Defendants fabricated evidence to create an incredibly weak case against an innocent man, and then conspired to withhold evidence from the prosecution that would undermine the false story they had pieced together and jeopardize any possibility of a conviction. This withheld evidence includes Defendants' investigation into alternate suspects, inconsistent statements by key witnesses, and evidence of Mr. Fontenot's alibi.

**Defendants' misconduct was the result of unconstitutional and systemic policies and practices of the Ada Police Department.**

159.   The unconstitutional and tortious acts of the defendant officers were not isolated incidents, but were instead part and parcel of an entrenched custom, policy, pattern or practice within the Ada Police Department.

160.   In particular, the Ada Police Department had a policy, custom or practice that its officers did not provide all relevant information gathered during an investigation—including, in particular, exculpatory or impeachment information—to the prosecution to enable the prosecution to fairly evaluate the case and comply with its *Brady* disclosure obligations. Instead, APD policy, custom or practice was the investigating officer had unfettered discretion as to what information was disclosed to the prosecution, and in practice that often was a small fraction of the information developed and excluded significant exculpatory or impeachment information.

161.   In addition to the custom, practice, or policy of giving individual officers unfettered discretion as to which exculpatory information to document or disclose to the prosecution, the Ada Police Department also provided no training or guidance on the legal

38

obligation to provide exculpatory information to the prosecution. As a result of this complete failure to train or provide guidance on this legal obligation, many APD officers (including officers in supervisory or leadership positions) did not understand in whole or in part their constitutional obligation to provide all exculpatory and impeachment information to the prosecution so that it could be provided to the defense.

162.    In addition, APD supervisors led by negative example, endorsing the practice of concealing exculpatory and impeachment information from the prosecution.

163.    For example, in this case, Ada Chief Fox, who was at first a Sergeant in the APD and before the time of Mr. Fontenot's second trial was the Chief of Police, was directly and personally involved with key investigative steps in the Haraway investigation, including taking the November 1984 statement from James Moyer in which he admitted he never got a good look at the dark haired man at the back of the store in McAnally's that he later identified as Karl Fontenot. But although Moyer was presented as a key witness against Mr. Fontenot at both trials—the only person to ever claim to identify him at McAnally's the day Haraway disappeared—this key prior statement from Moyer was never disclosed to the prosecution. On information and belief, Ada Chief Fox and Detective Barrett were aware this and other exculpatory information was not disclosed and either tacitly or expressly endorsed this suppression of exculpatory and impeachment evidence.

164.    The sheer amount of APD investigative material that was withheld—both at the time of both trials and for decades afterwards—is staggering. Although the Haraway investigation generated many hundreds of pages of notes, memos, reports and other documents, only a small fraction were ever disclosed to the prosecution. Many hundreds of pages were only disclosed years after Mr. Fontenot's conviction, despite both the initial obligation to provide this

information to the prosecution and ongoing discovery as part of post-conviction efforts to

overturn Mr. Fontenot's wrongful conviction. Indeed, after decades of discovery and numerous

false representations from the Ada Police Department that relevant documents did not exist, over

300 pages of police reports—including some critical exculpatory and impeachment evidence—

were first disclosed in January 2019.

165.    The APD's systematic suppression of exculpatory and impeachment evidence was

not limited to this case. For example, Dennis Fritz and Ronald Williamson were both wrongfully

convicted of the 1982 Ada murder of Debra Sue Carter—a crime they did not commit—as a

direct result of misconduct by the very same Ada officer—Defendant Smith—and the same final

policymaker—Ada Chief Fox—as in this matter. Despite Fritz's and Williamson's truthful

protestations of innocence, APD officers, including Defendant Smith, buried exculpatory

evidence, including an initial statement by actual killer and key prosecution witness Glen Gore

that made no mention of Williamson and a statement by a jail witness, James Riggins, who had

overheard Gore's confession to the crime. Fritz and Williamson were both tried and convicted of

first-degree murder in 1988. Fritz was sentenced to life in prison, and Williamson to death, with

Williamson spending the majority of his sentence confined to death row, despite his history of

mental illness. In April 1999, post-conviction DNA testing exonerated Fritz and Williamson,

while conclusively implicating Gore, after more than twelve years of wrongful imprisonment.

Gore was subsequently convicted of the murder.

166.    During a subsequent § 1983 wrongful conviction suit against the City of Ada and

other defendants on behalf of Fritz and Williamson, exculpatory evidence was disclosed that had

never been turned over either pre-trial or during extensive post-conviction litigation. The lawsuit

also amassed evidence of the systematic failures of the APD and OSBI to disclose exculpatory

and impeachment evidence to the prosecution. Although this evidence of systematic failures was publicly filed in this suit involving the APD by early 2002, the APD continued for nearly two additional decades to withhold key exculpatory evidence relevant to Mr. Fontenot's post-conviction proceedings.

167.    In addition to the systematic suppression of exculpatory and impeachment evidence by the APD, other unconstitutional investigative customs, policies, and practices plagued the APD, as evidenced by the widespread misconduct in both the Haraway and Carter investigations. In particular, both cases involved strikingly similar egregious investigative misconduct, including coercing and fabricating a false confession to a horrific murder from a vulnerable suspect. Indeed, the Carter case even involved a manipulated "dream" confession, just as this one did, and, just as in this case, APD and OSBI officers misrepresented the source of information in the statement to falsely make it appear more reliable. In addition, just as in the Haraway case, in the Carter investigation APD and OSBI officers intimidated and coerced witnesses into providing accounts supporting the prosecution, including in one instance in the Carter investigation displaying a gun and threatening the witness with "lead poisoning" if witness didn't agree to give statement implicating suspect that witness had already told them he could not honestly give.

168.    Such widespread and blatant investigative misconduct—in the most significant and high-profile investigations in which the APD was involved—was only possible because of the APD's complete failure to adequately train, supervise and discipline its officers, as well as a culture which at least tacitly endorsed the use of lawless investigative practices to close cases and get convictions. On information and belief, the relevant APD policymakers, were personally aware of this misconduct occurring openly and notoriously within this small department in this

41

high profile case, and openly or tacitly endorsed it.

**Mr. Fontenot is wrongfully convicted as a result of coerced and fabricated confessions, fabricated statements from jailhouse snitches, and unreliable "eyewitness" testimony.**

169.    Mr. Fontenot and Mr. Ward were jointly tried in September 1985. No physical or forensic evidence connected Mr. Fontenot to the crime. Haraway's body had still not been found.

170.    The primary evidence offered against Fontenot were the tape-recorded statements from both him and Ward, even though they had been demonstrated to be false in many respects. Other evidence offered against Mr. Fontenot were the false and fabricated claims by jailhouse snitches Leonard Martin and Terri Holland that Fontenot had confessed to them. Finally, there was testimony from Karen Wise that Fontenot looked familiar, but she couldn't say if he was one of the men she saw in JP's the night of Haraway's disappearance. And there was testimony from Moyer that although he had previously thought Karl Fontenot was the dark-haired person he saw in McAnally's, he now believed Karl Fontenot was shorter than the man he saw.

171.    Because Defendants intentionally withheld evidence from the prosecutor, the jury never heard evidence critically relevant to reaching their verdict. Information that the jury never received included:

    a.    Witness accounts of Haraway's statements concerning the obscene phone calls she received while at work;

    b.    Police reports detailing the phone calls that the APD received from customers in McAnally's the night of Haraway's disappearance, which included descriptions of other plausible suspects;

    c.    Reports detailing the police's investigation into alternate suspects;

    d.    Inconsistent statements given by key witnesses to the police;

e. Evidence of Mr. Fontenot's presence at the house party on April 28, 1984;

f. Evidence of Defendants hypnotizing key witnesses in order to collect information;

g. And hundreds of police reports detailing their investigation, which continued months after Mr. Fontenot was arrested and charged.

172.   Based on this false, fabricated, and coerced evidence, and in the absence of this suppressed exculpatory evidence, on October 25, 1985, the jury convicted Mr. Fontenot of robbery, kidnapping, and murder. He was sentenced to death.

173.   Before being sentenced, Mr. Fontenot asked the Court to inform him when they find the people who committed these crimes, as he said that the Court would know some day.

174.   Mr. Fontenot appealed the Court's decision. Two months following Mr. Fontenot's trial and sentencing, Denice Haraway's body was finally found.

**Nearly two years after her disappearance, Denice Haraway's remains are recovered on January 20, 1986. The physical evidence directly contradicts Mr. Fontenot's confession.**

175.   Two years after her disappearance, Denice Haraway's skeletal remains were found on January 20, 1986 in Gerty, Oklahoma. A bullet hole was found in the back of her skull.

176.   The location of Haraway's remains, and the physical evidence on her bones, directly contradicted Mr. Fontenot's confession.

a. Gerty, Oklahoma is located approximately 30 miles away from where Mr. Fontenot stated he allegedly left Haraway's body.

b. Though the confession stated that Haraway died from multiple stab wounds, and that no other weapons were used, the medical examiner did not find any evidence of Haraway being stabbed. Instead, a bullet hole was found in the back of her skull.

c. The confession stated Haraway's body was burned after she died. No evidence

suggests she was burned.

d.  The confession also stated that Haraway's clothes were burned separately from her body. When Haraway's body was found, her clothes were also there, and had not been burned.

177.    There was also evidence from Haraway's remains that she had had a natural child birth before her death. Haraway had never had a child before her abduction, but had reported to a friend near the time of her disappearance that she was three months pregnant. Evidence that Haraway had a child subsequent to her disappearance is plainly exculpatory, as that is completely inconsistent with the prosecution theory that Mr. Fontenot killed her on April 28, 1984.

**Mr. Fontenot's conviction is reversed and he is retried.**

178.    On August 11, 1987, the Oklahoma Court of Criminal Appeals reversed Mr. Fontenot's conviction and ordered a new trial. It found that Ward's confession should not have been admitted against Fontenot, especially as it lacked indicia of reliability. As the court noted: "Other than the statements given by Ward and Fontenot, there was no other evidence linking [Fontenot] to the crimes." Mr. Ward's conviction was similarly vacated and he was granted a new, separate trial as well.

179.    Despite the serious problems with the evidence against him—including blatant contradictions between the confession and the known evidence about the crime—Mr. Fontenot was re-tried in June 1988.

180.    The case against Mr. Fontenot at this retrial was extremely weak. No physical evidence implicated Mr. Fontenot and there was no plausible motive. The evidence at the retrial largely mirrored the evidence at the first trial, with the exception that Ward's confession was not

admitted. In the absence of the exculpatory information suppressed by Defendants, no alibi defense was presented nor was evidence presented of the many other more plausible suspects. Nor did the defense have the other suppressed evidence to impeach the prosecution witnesses or prosecution version of events.

181.    In light of the obvious problems with the confession, the prosecution relied heavily on the fabricated evidence from Defendants that Mr. Fontenot volunteered details independently, including nonpublic information that demonstrated his guilt. In particular, Defendants claimed that Mr. Fontenot volunteered a detailed description of the blouse Haraway was wearing that night, which they falsely claimed they did not know before they obtained the confession. In closing argument, the prosecution asserted "it would be impossible for someone to make up that description of the blouse. Doubly impossible for two and that leaves us with only one alternative, and that is that this Defendant was there, just like he confessed he was." Based on this fabricated evidence, and without the exculpatory evidence that had been suppressed, on June 14, 1988, Mr. Fontenot was again convicted of robbery, kidnapping, and murder. He was again sentenced to death.

182.    On June 8, 1994, Mr. Fontenot's death sentence was overturned by the Oklahoma Court of Criminal Appeals. He was subsequently sentenced to life imprisonment without the possibility of parole.

**Mr. Fontenot continuously fought for his freedom after being wrongfully convicted a second time.**

183.    Mr. Fontenot was first convicted on October 25, 1985, and sentenced to death. He was then convicted a second time on June 14, 1988, and again sentenced to death. He never stopped fighting for his release.

184.     Almost immediately after being pressured to falsely confess, Mr. Fontenot has explained his innocence and fought for his freedom.  Mr. Fontenot's quest to overturn his wrongful conviction and prove his innocence was continually hampered by Defendants' continued misrepresentations and suppression of exculpatory evidence. Despite two court orders and a federal subpoena, Defendants failed to turn over critical exculpatory evidence establishing his innocence for over 25 years, including hundreds of pages of police reports from the original investigation by the Ada Police Department, and numerous additional reports from the OSBI.

**Mr. Fontenot is freed after being imprisoned for more than half of his life for a crime he did not commit.**

185.     On August 21, 2019, after being incarcerated for over 35 years, District Judge James Payne granted Mr. Fontenot's Second Amended Writ of Habeas Corpus. In his 190-page opinion, Judge Payne found both solid proof of Mr. Fontenot's innocence and that law enforcement misconduct deeply permeated the investigation into Denice Haraway's disappearance. In particular, the District Court found that law enforcement suppression of exculpatory evidence had deprived Mr. Fontenot of a fair trial. The Court ordered the conviction vacated and Mr. Fontenot released if he was not retried within 120 days.

186.     The State appealed. Mr. Fontenot was released from custody on December 19, 2019—120 days after the district court's order, and over 35 years after he was first arrested and jailed for the murder of Denice Haraway. He continued to be subject to conditions of release pending the appeal.

187.     When Mr. Fontenot was arrested on October 19, 1984, he was 20 years old. He remained incarcerated until he was 55 years old.

46

188.     Of the 35 years Mr. Fontenot spent incarcerated, nearly 8 of them were spent awaiting execution by the State before his death sentence was overturned.

189.     On July 13, 2021, the Tenth Circuit Court of Appeals affirmed the district court's vacatur of Mr. Fontenot's conviction. It found Mr. Fontenot presented an "extraordinary case" of new evidence of his actual innocence sufficient to meet the standard in *Schlup v. Delo*, 513 U.S. 298 (1995), necessary to address his otherwise time-barred constitutional claims.  It also agreed that Mr. Fontenot had not received a fair trial due to law enforcement suppression of exculpatory evidence.  The Tenth Circuit lifted the stay of the district court's order granting a new trial.

## V.     DAMAGES

190.     Defendants' actions deprived Plaintiff Karl Fontenot of his civil rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as the Constitution and statutes of the state of Oklahoma.

191.     This action seeks damages for the period from October 19, 1984, through each and every year to the present, and continuing into the future. The unlawful, intentional, willful, deliberately indifferent, reckless, or bad-faith acts and omissions of Defendants caused Karl Fontenot to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 12,844 days—over 35 years—in jail and prison for a crime he did not commit.

192.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Fontenot sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 35 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities and embarrassment; degradation; permanent loss of

47

natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

193.    Mr. Fontenot continues to suffer physical, emotional, mental, and psychological damage as a result of the Defendants' conduct.

194.    These injuries and damages to Mr. Fontenot were foreseeable to Defendants at the time of their acts and omissions.

195.    All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## VI.    CAUSES OF ACTION

### COUNT I

**42 U.S.C. § 1983 claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial, Under the Fourteenth Amendment, based on the fabrication of false evidence, including false confessions**

**Against Defendants Baskin, Smith, Rogers, Featherstone, and Peterson**

196.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

197.    These Defendants fabricated false evidence of Mr. Fontenot's guilt, thereby violating Mr. Fontenot's right to a fair trial and causing him to be deprived of his liberty without due process of law.

198.     As described in greater detail above, these Defendants fabricated evidence prior to trial, including fabricating the videotaped statements of Ward and Fontenot by feeding them information and then falsely representing it originated with the witnesses rather than the detectives, these Defendants also fabricated witness statements, including by coercing and intimidating witnesses to give statements they had made clear they knew were false, and using impermissibly suggestive identification procedures they knew or should have known would produce false results

199.     Defendants fabricated this evidence knowingly or in reckless disregard for the truth.

200.     That fabricated evidence, individually and collectively, caused Mr. Fontenot to be deprived of his liberty as it was used to arrest Mr. Fontenot, to prosecute him, and at trial as the basis for the jury's guilty verdicts.

201.     Defendants, individually and in concert, continued their investigation of Mr. Fontenot despite the fact that they knew or should have known that he was innocent based on the evidence collected from the crime scene.

202.     The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Mr. Fontenot's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law.

203.     As a direct and proximate result of Defendants' Baskin, Smith, Rogers, Featherstone, and Peterson's actions, Mr. Fontenot was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced to life in prison, incarcerated for over 35 years, wrongfully convicted, and suffered the other grievous injuries and damages set forth above.

49

## COUNT II

**42 U.S.C. § 1983 claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial, Under the Fourteenth Amendment, based on withholding exculpatory evidence from the prosecution and defense**

**Against Defendants Baskin, Smith, Rogers, Featherstone, and Roberts**

204.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

205.    These Defendants withheld exculpatory evidence from the prosecution and defense, thereby violating the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

206.    Defendants, individually and in concert, in an effort to secure Mr. Fontenot's conviction without regard to his actual innocence, deliberately and in bad faith deprived Mr. Fontenot of his Due Process rights.

207.    Defendants, individually and in concert, in an effort to secure Mr. Fontenot's conviction without regard to his actual innocence, intentionally suppressed material, exculpatory and impeachment information from Mr. Fontenot, his defense counsel, and the prosecution in violation of the Constitution and *Brady v. Maryland*, including but not limited to evidence pointing to other suspects, evidence impeaching the statements of prosecution witnesses, evidence confirming Mr. Fontenot's alibi, and evidence impeaching the Haraway investigation as a whole.

208.    Evidence of Defendants' misconduct could have been used to undermine key evidence relied on by Defendants in this investigation. Had it been disclosed, it could have been used at trial to impeach Defendants and witnesses as well as the quality of the entire investigation.

209.    Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Mr. Fontenot's defense. Had Defendants not engaged in such misconduct or had their misconduct been disclosed, the evidence would have tended to prove Mr. Fontenot's innocence, cast doubt on the entire police investigation and prosecution, and most likely would have created a different result at trial.

210.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Mr. Fontenot's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law.

211.    As a direct and proximate result of Defendants Baskin, Smith, , Rogers, Featherstone, and Roberts's, actions, Mr. Fontenot was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced to life in prison, incarcerated for over 35 years, wrongfully convicted, and suffered the other grievous injuries and damages set forth above.

## COUNT III

**42 U.S.C. § 1983 Claim for Post-Trial Deprivation of Liberty Without Due Process of Law Under the Fourteenth Amendment**

**Against Defendants Baskin, Smith, Rogers, Featherstone, and Roberts**

212.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

213.    These defendants, individually and in concert, in an effort to preserve Mr. Fontenot's conviction without regard to his actual innocence, intentionally or with deliberate indifference and in bad faith refused to take steps that they knew or should have known could have produced evidence of Mr. Fontenot's innocence, in violation of the Constitution. For

example, and without limitation, Defendants failed to produce exculpatory evidence in their possession for decades, despite ongoing post-conviction proceedings and court orders to produce the relevant evidence. Instead, the APD falsely represented this information did not exist.

214.    Mr. Fontenot had a liberty interest in proving his innocence, including through newly discovered exculpatory evidence. Some of this key exculpatory evidence was not produced until January 2019—and only six months later his habeas corpus petition was granted and shortly thereafter he was released from custody. Had this exculpatory evidence been disclosed sooner, Mr. Fontenot could have established his entitlement to habeas relief earlier than he did.

215.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Mr. Fontenot's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the Ada Police Department, the Oklahoma State Bureau of Investigation, and the Pontotoc County Sheriff's Office. As a direct and proximate result of Defendants' misconduct, Mr. Fontenot's incarceration was wrongfully extended, and Mr. Fontenot continued to suffer all of the grievous injuries and damages set forth above.

## COUNT IV

### 42 U.S.C. § 1983 Claim for Violation of the Right Against Self-Incrimination in Violation of the Fifth and Fourteenth Amendment

### Against Defendants Smith, Rogers, Baskin, and Featherstone

216.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

217.    Although Mr. Fontenot had nothing to do with Haraway's murder, and knowing his obvious vulnerabilities, including his mental deficits and PTSD, these Defendants repeatedly threatened, manipulated, and lied to Mr. Fontenot in order to coerce a false and fabricated confession from him in violation of his Fifth and Fourteenth Amendment rights.

218.    Defendants' coercive interrogation techniques shock the conscience and violate the decencies of civilized conduct. By interrogating Mr. Fontenot in this manner and doing nothing subsequent to stop the violation, Defendants set in motion a series of acts by others which they knew or reasonably should have known would cause these statements to be used against Mr. Fontenot at trial, thereby inflicting constitutional injury.

219.    As a direct and proximate result of Defendants' actions, Mr. Fontenot was wrongly arrested, detained, charged with murder, prosecuted, convicted, and sentenced to death twice.

## COUNT V

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim

### Against Defendants Baskin, Smith, Rogers, Featherstone, Roberts, and Peterson

220.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

221.    These Defendants, and others yet unknown, agreed among themselves to act in concert to deprive Mr. Fontenot of his clearly established constitutional rights as protected by the Fourth, Fifth, and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law and be free from illegal seizure.

222.     As described in detail above, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including the extensive investigative misconduct detailed above.

223.     As a direct and proximate result of Defendants' overt acts, Mr. Fontenot was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over 35 years; and subjected to other grievous injuries and damages as set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Failure to Intervene

### Against Defendants Baskin, Smith, Rogers, Featherstone, and Roberts

224.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

225.     By their conduct and under color of state law, these Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Mr. Fontenot to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference declined to do so. No reasonable officer in 1984 would have believed this conduct was lawful.

226.     Defendants' failures to intervene violated Mr. Fontenot's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1984 would have believed that failing to intervene to prevent Defendants from fabricating inculpatory evidence, concealing and withholding exculpatory evidence, or causing Mr. Fontenot to be arrested and prosecuted without probable cause, were lawful.

227.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Fontenot's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Fontenot's wrongful arrest, prosecution, conviction, and incarceration.

228.    The actions and omissions of Defendants Baskin, Smith, Rogers, Featherstone, and Roberts, in their individual capacities, caused Mr. Fontenot to be wrongly arrested, detained, charged with rape and murder, prosecuted, convicted, sentenced, and incarcerated for over 35 years. As a result, Mr. Fontenot suffered the constitutional deprivations and grievous personal injuries and damages described above.

**COUNT VII**

**42 U.S.C. § 1983 *Monell* Claim**

**Against Defendant the City of Ada**

229.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

230.    Defendant the City of Ada, by and through its final policymakers, was at all times relevant to this complaint responsible for the policies, practices, and customs of the Ada Police Department.

231.    The Defendant City of Ada, by and through its final policymakers had a policy, custom or practice of withholding key information obtained in investigations—including, in particular, exculpatory and impeachment information—from the prosecution and defense.

232.    Defendant the City of Ada, by and through its final policymakers, also failed to adequately train or supervise its officers to ensure compliance with constitutional obligations during investigations, including in particular obligations under *Brady v. Maryland* to disclose

relevant exculpatory and/or impeachment information to the prosecution so that that information could be disclosed to the defense. Despite actual and/or constructive knowledge by the policymakers of the obvious need that additional training and/or supervision was necessary to prevent constitutional violations, Defendant the City of Ada failed to take reasonably necessary action to provide that additional training and/or supervision.

233.    Pursuant to these customs, policies, and practices, Defendant the City of Ada withheld key exculpatory and impeachment evidence not only before Mr. Fontenot's two trials but during on-going post-conviction proceedings and in violation of court orders, for a total of nearly 35 years.

234.    Defendant the City of Ada, by and through its final policymakers, also failed to adequately train, supervise, or discipline its officers to prevent blatant misconduct and ensure compliance with constitutional obligations during investigations. Only as a result of such failures to train, supervise and discipline was the widespread, extraordinary, and open misconduct in the Ada Police Department possible. This misconduct permeated two of the most high-profile investigations of that time period: the Haraway investigation and the Carter investigation, including through the fabrication and coercion of false witness statements and suppression of exculpatory evidence, resulting in the wrongful convictions of several demonstrably innocent men. Furthermore, more general and extensive failures to supervise and discipline for other types of open and notorious misconduct within the Ada Police Department fostered a culture that permitted serious investigative misconduct to proceed unchecked.

235.    On information and belief, the final policymaker for the City of Ada with respect to the police department was personally aware of the blatant, open and notorious misconduct engaged in by his subordinate officers, who were under his direct supervision, given the small

size of the Ada Police Department and the high-profile nature of the investigation into the murder of Denice Haraway and Debra Sue Carter. On information and belief, the final policymakers were directly involved in the unconstitutional misconduct in these high-profile investigations and explicitly or tacitly condoned this misconduct. On information and belief, the final policymaker for the City of Ada with respect to the police department, was also actually or constructively aware of other types of open and notorious misconduct by Ada Police Department employees during this time period but failed to take obviously necessary action in response, fostering a culture of impunity that permitted the unconstitutional misconduct to continue.

236.    The final policymaker for the City of Ada had actual or constructive notice of these practices, policies, and customs, but failed to take obviously necessary remedial steps to prevent this misconduct from occurring.

237.    Such unconstitutional municipal customs, practices and/or policies were the moving force behind Mr. Fontenot's wrongful arrest, confinement, prosecution, trial, conviction, incarceration, and other injuries as set forth above.

## OKLAHOMA STATE LAW CLAIMS

## <u>COUNT VIII</u>

**State Law Claim for Intentional Infliction of Emotional Distress**

**Against Defendants Baskin, Smith, Rogers, Featherstone, Roberts, and Peterson**

238.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

239.    The acts and conduct of these Defendants as set forth above were extreme and outrageous. These Defendants' actions were rooted in an abuse of power or authority, and they

were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully described above.

240.    As a direct and proximate result of these Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## COUNT IX

### State Law Claim for Negligence

### Against Defendants Baskin, Smith, Rogers, Featherstone, Roberts, and Peterson

241.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

242.    All these Defendants are liable for negligence, having breached the duty of reasonable care they each owed to Mr. Fontenot.

243.    Defendants' negligence and gross negligence directly and proximately caused Mr. Fontenot, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongfully imprisoned for more than 35 years and to suffer the damages previously described.

## COUNT X

### State Law Claim for False Imprisonment

### Against Defendants Baskin, Smith, Rogers, Featherstone, Roberts, and Peterson

244.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

245.    The conduct of the above-named Defendants directly resulted in the false imprisonment of Mr. Fontenot while acting in the scope of their employment for the Ada Police

Department, the Oklahoma State Bureau of Investigation, the Pontotoc County Sheriff's Office, and the Pontotoc County District Attorney's Office.

246.    Mr. Fontenot's liberty of movement and freedom to remain in the place of his own lawful choice was violated by his wrongful conviction causing him to be restrained against his will.

247.    The restraint of Mr. Fontenot against his will was caused by these Defendants' intentional conduct in fabricating evidence, coercing false confessions, and concealing exculpatory evidence.

248.    As a direct and proximate result of Defendants' actions, Mr. Fontenot suffered the grievous injuries and damages set forth above.

## COUNT XI

**State Law Claim for Respondeat Superior**

**Against Defendants City of Ada, Board of Pontotoc County Commissioners, and State of Oklahoma**

249.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

250.    In committing the acts alleged in the preceding paragraphs, each of the Defendants Baskin, and Smith were employees and agents of the police department of the defendant City of Ada, acting at all relevant times within the scope of their employment and under color of law.

251.    Defendant City of Ada is liable as principal for all torts committed by its agents.

252.    In committing the acts alleged in the preceding paragraphs, Defendant Peterson was an employee and agent of the district attorney's office of the defendant Board of Pontotoc

59

County Commissioners, acting at all relevant times within the scope of their employment and under color of law.

253.    Defendant Board of Pontotoc County Commissioners is liable as principal for all torts committed by its agents.

254.    In committing the acts alleged in the preceding paragraphs, each of the Defendants Rogers, Featherstone, and Roberts were employees and agents of the bureau of investigation of the defendant State of Oklahoma, acting at all relevant times within the scope of their employment and under color of law.

255.    Defendant State of Oklahoma is liable as principal for all torts committed by its agents.

**WHEREFORE**, Plaintiff Karl Fontenot prays as follows:

A. That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which Plaintiff may be entitled.

DATED: June 3, 2022                              Respectfully submitted,

                                                 **/s/ Tiffany Murphy**

                                                 Tiffany Murphy
                                                 790 N. Cliffside Dr.
                                                 Fayetteville, AR 72701
                                                 tiffanym@uark.edu
                                                 T: 479-575-3056

                                                 Nick Brustin (*admitted pro hac vice*)
                                                 Anna Benvenutti Hoffmann (*admitted pro
                                                 hac vice*)
                                                 Neufeld Scheck & Brustin, LLP
                                                 99 Hudson Street, 8th Floor
                                                 New York, NY 10013
                                                 nick@nsbcivilrights.com
                                                 anna@nsbcivilrights.com
                                                 T: 212-965-9081

                                                 Doug Parr
                                                 228 Robert S. Kerr Avenue, Suite 715
                                                 Oklahoma City, OK 73102
                                                 OK Bar No. 6907
                                                 doug@parrlawoffice.com
                                                 T: 800-787-2415